UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INCITES INVESTMENT LIMITED,

    Plaintiff,

v.

PQIL LLC a/k/a PROQUEST,

    Defendant.

_____/

Case No. 16-cv-13100

Judith E. Levy
United States District Judge

Mag. Judge Stephanie Dawkins Davis

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS [13]

This is a diversity case in which plaintiff brings four causes of action against defendant for breaching the two agreements defendant had with a third party. Before the Court is defendant's motion to dismiss the complaint for failure to state a claim. (Dkt. 13.) For the reasons set forth below, plaintiff's contract claims may proceed and its open account and quantum meruit claims are dismissed.

## I. Background

Because the case is before the Court on defendant's motion to dismiss, the following background is drawn from plaintiff's complaint accepting all allegations as true and in the light most favorable to plaintiff, unless otherwise noted.

Defendant is engaged in the business of delivering information, primarily to libraries worldwide, for use by researchers. (Dkt. 1 at 2.) Defendant contracted with Netcopy—a third party that has since gone out of business—to assist with delivering International Publishing Corporation's ("IPC's") music magazine archives to the education market (the "Music Project"). (*Id.* at 3.) On or about July 9, 2012, Netcopy and defendant entered into a Master Services Agreement ("MSA"). (*Id.*) In accordance with the MSA, Netcopy and defendant entered into a specific Statement of Work, which set the terms for the work to be performed in connection with the Music Project. (*Id.*) Under the Statement of Work, Netcopy was to scan and process the original magazines for defendant's use in creating the required content. (*Id.*)

While performing the services, Netcopy noticed that the original source material was in poor condition. (Dkt. 1 at 4.) Netcopy thus

produced a sample batch for defendant to review. (*Id.*) After receiving the sample batch, defendant consented to Netcopy proceeding with the contracted work. (*Id.*) Although the scanned material was delivered to defendant at or in excess of specification, the product often reflected the known poor condition. (*Id.*) Defendant informed Netcopy that it would audit the Music Project scans, thereby putting the project on hold. (*Id.*) As of the time the project was suspended, Netcopy had scanned, processed, and delivered 346,377 pages of content—work valued at £225,145.05 pursuant to the MSA and Statement of Work. (*Id.*) Defendant has paid £117,000, so there remains a £108,145.05 balance, which has an approximate U.S. Dollar value of $140,605.87. (*Id.*)

On July 18, 2013, defendant and Netcopy entered into a second agreement, by email exchange, to scan approximately 600,000 images related to a different archive of IPC (the "Country Life" project). (Dkts. 1 at 6, 1-3.) Netcopy scanned the source material and invoiced defendant for £36,437.76—approximately $47,374.92 in U.S. Dollar value. Defendant made no payments toward this outstanding balance. (Dkt. 1 at 6.)

In May 2014, Netcopy became insolvent and its assets, including the indebtedness owing from the defendant, was placed with a receiver for liquidation under the laws of the United Kingdom. (Dkts. 1 at 5, 13 at 13.) The liquidators sold and assigned the balances owing from defendant to Half Baked Ideas Ltd. (Dkt. 1 at 5.) On July 24, 2015, Half Baked Ideas assigned the rights to the debt to plaintiff. Plaintiff now holds the right to any claims Netcopy may have related to these transactions. (*Id.*)

Plaintiff initiated this action with the following counts: two claims for breach of contract (the "Music Project" and "Country Life" contracts, individually), an action for open account, and a claim for quantum meruit. (*See* Dkt. 1.) Defendant moved to dismiss all counts under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II. Standard

When deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to

state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plausible claim need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### III. Analysis

As set forth below, plaintiff is precluded from bringing Counts III and IV because there are express contracts between the parties. Thus, whether defendant's motion to dismiss is granted in its entirety turns on whether Counts I and II are sufficiently pleaded.

"A party claiming a breach of contract must establish (1) that there was a contract, (2) that the other party breached the contract and, [*sic*] (3) that the party asserting breach of contract suffered damages as a result of the breach." *Dunn v. Bennett*, 303 Mich. App. 767, 774 (2013) (quoting *Miller-Davis Co. v. Ahrens Constr., Inc.,* 296 Mich. App. 56, 71 (2012)). It is undisputed that contracts govern both the "Music Project" and "Country Life" project. Thus, for defendant to prevail on its motion to dismiss, defendant must demonstrate that plaintiff fails to sufficiently

plead that defendant breached the alleged contracts and that the breaches caused damage to plaintiff.

### a. Count I: The breach of contract claim as to the Music Project is sufficiently pleaded

Defendant argues that "[b]ecause Netcopy failed to scan and convert all [600,000 images], defendant in no way breached the agreement by failing to pay for services that were never performed." (Dkt. 13 at 17.) According to defendant, plaintiff failed to state a claim because Netcopy failed to convert the 346,377 images in accordance with the contract's specifications. (*Id.* at 16.) Defendant also argues that it complied with the agreement because the Music Project was under audit when Netcopy became insolvent, and Netcopy had an obligation to correct quality issues at no charge. (*Id.*)

Plaintiff responds that the 600,000 figure was an approximation, not an exact requirement. (Dkt. 18 at 13.) Moreover, plaintiff argues, it need not plead that Netcopy completed the Music Project to have sufficiently pleaded a breach. (*Id.* at 14-15.) And, according to plaintiff, defendant's argument that Netcopy only performed services to support payment for scanning and not processing, or, as stated by defendant, converting, 347,377 images is a factual dispute. (*Id.* at 14.) Finally,

plaintiff argues that the audit did not constitute a "Non-Conformance Notice" under the MSA, and thus plaintiff was not obligated to address any nonconformance. (*Id.*)

Under Michigan law, the Court's "primary role in interpreting a contract . . . is to determine and enforce the parties' intent." *Dietrich v. Bell, Inc.*, 554 F. App'x 418, 423 (6th Cir. 2014) (citing *Stine v. Cont'l Cas. Co.*, 419 Mich. 89, 112 (1984)). "To this rule all others are subordinate." *Shay v. Aldrich*, 487 Mich. 648, 660 (2010) (quoting *McIntosh v. Groomes*, 227 Mich. 215, 218 (1924)). "A court will ascertain the intent of the parties from the plain and unambiguous language of a contract." *Mich. Bell Tel. Co. v. MCIMetro Access Transmission Servs.*, 323 F.3d 348, 357 (6th Cir. 2003) (citing *Haywood v. Folwer*, 190 Mich. App. 253, 258 (1991)).

### i. Netcopy did not have to complete performance to receive payment for services already performed

The MSA's language indicates that there was no intent to postpone payment until all 600,000 images were scanned and converted. In relevant part, Sections 4(a), 4(b), and 4(c) of the MSA, which set forth terms for invoicing, payment, and taxes, state the following:

7

(a) <u>Invoice</u>
    i. On a monthly basis, Vendor shall provide ProQuest with a written invoice for the services provided to ProQuest during the preceding month.
(b) <u>Payment</u>
    i. Each invoice for Services delivered to ProQuest in accordance with section 4(a) hereof shall be paid by ProQuest no more than thirty (30) days after the receipt of a valid and applicable invoice.
(c) The parties acknowledge that ProQuest contemplates a purchase order system for this Agreement and the invoice and payment terms described in Sections 4a and 4b above shall only remain in place until such purchase order system is available; whereby, the parties shall then convert to such purchase order system for all payments due hereunder.

(Dkt. 1-1 at 5.)

Defendant's argument that the Music Project had to be complete before its payment became due conflicts with the plain language of the contract. Together, Sections 4(a), 4(b), and 4(c) establish that Netcopy would provide defendant with a valid invoice for the preceding month's services. In turn, defendant would pay Netcopy "no more than thirty days" after receipt, and, once created, defendant would pay according to a purchase order system thereafter. Defendant's obligation to pay was therefore not contingent on Netcopy completing the entire Music Project.

### ii. Defendant's audit of the Music Project did not release defendant from its obligation to pay Netcopy for services already performed

It is undisputed that defendant had a "contractual right to audit the finished product and determine whether Netcopy had adhered to the Statement of Work's specification." (Dkt. 19 at 4.) But, under the terms of the contract, this right did not terminate Netcopy's right to payment for services rendered. Under Section 10 of the MSA:

(a) If ProQuest determines that any delivered Service does not meet the Specifications, performance standards or deadlines (including without limitation the Uptime and Turn Around Time requirements) set forth in the applicable Statement of Work, ProQuest shall provide a written notice (the "Non-Conformance Notice") to Vendor specifically stating the non-conformity, and setting for the sufficient detail to demonstrate how such determination was made.

(b) Vendor shall either correct the non-conformity at no charge within thirty (30) days of Vendor's receipt of the related Non-Conformance Notice, or Vendor shall notify ProQuest within five (5) days after receipt of the Non-Conformance Notice that Vendor is not responsible for the nonconformity. If there is a disagreement over responsibility for the non-conformity, the Engagement Managers will attempt in good faith to resolve the disagreement; *provided however*, that if the disagreement remains unresolved for thirty (30) days after escalation to the Engagement Managers, ProQeust may terminate this Agreement pursuant to Section 10(b).

(Dkt. 1-1 at 7-8.)

Pursuant to Section 10, the Music Project being placed under audit, without more, did not satisfy defendant's obligation to provide Netcopy with a written notice of nonconformity. Moreover, Section 10 does not indicate that nonconformance has any bearing on the payment schedule, as expressly set forth above.

The plain language of the MSA—specifically, Sections 4(a), 4(b), 4(c), and 10—indicates that Netcopy, if all allegations are true, is due payment for work performed, even in cases of nonconformity.[1] These sections provide that defendant had an obligation to pay for services rendered so long as Netcopy stayed in compliance with 4(a) and 4(b) and, upon the development of the purchase order system, 4(c). In the case of nonconformance, defendant's recourse was for Netcopy to correct the nonconformity at no additional cost. In the case of a disagreement over responsibility for the nonconformity, there would be a good faith effort to resolve the disagreement. Finally, if the disagreement remained 30 days thereafter, defendant had the option to terminate the agreement and

---

[1] "Courts must construe contracts as a whole; if reasonably possible, all parts and every word should be considered; no part should be eliminated or stricken by another part unless absolutely necessary." *Mich. Bell Tel. Co.*, 323 F.3d at 357 (quoting *Workmon v. Publishers Clearing House*, 118 F.3d 457, 459 (6th Cir. 1997)).

seek damages. The agreement did not provide for withholding payment without following these steps.

As set forth above, Netcopy was not required to complete the entire Music Project and defendant's audit of the Music Project did not preclude Netcopy from receiving payment. Thus, without considering evidence to the contrary, which the Court cannot do at this stage, Netcopy had a right to receive payment for the services rendered, so long as it complied with the MSA and State of Work. Plaintiff has alleged that Netcopy scanned, processed, and delivered 346,377 pages of content valued, pursuant to the agreement, in the amount of £225,145.05, and that defendant has failed to pay £108,145.05 of the balance. (Dkt. 1 at 4.) Accepting these allegations as true, plaintiff has demonstrated a breach and damages. Accordingly, defendant's motion to dismiss this claim is denied.

### b. Count II: The breach of contract claim as to the Country Life project is sufficiently pleaded

Defendant argues that plaintiff has not stated a plausible claim for breach of contract because it could not breach its Country Life agreement given plaintiff's failure to allege "Netcopy scanned the 600,000 images." (Dkt. 13 at 17.) It is undisputed that the Country Life agreement was established through email exchange. (Dkts. 1 at 6, 13 at 13.) Like the

11

Music Project, the Country Life agreement is also subject to the terms and provisions of the MSA.[2]

As set forth above, Netcopy did not have to scan all 600,000 images to receive payment for its services. Rather, as defendant received valid invoices for services rendered, defendant would then pay pursuant to the payment schedule set forth in the MSA. Plaintiff alleges Netcopy provided services "as per the agreement," invoiced defendant, and never received payment, which is sufficient to allege a breach—Netcopy had a right to receive payment for services rendered pursuant to the MSA. (Dkt. 1 at 6.)

Relatedly, defendant argues that plaintiff failed to identify how many pages (or images) Netcopy scanned. (Dkt. 19 at 5.) Plaintiff need not plead a specific quantity. Plaintiff's allegation that "Netcopy scanned the source material as per the engagement" is sufficient. (Dkt. 1 at 6.)

As set forth above, plaintiff has alleged that there was a contract and breach. And plaintiff has also alleged defendant's breach resulted in

---

[2] The parties agreed at the hearing that the Country Life project is also governed by the MSA. This is borne out by the terms of the MSA and allegations. The MSA became effective on July 9, 2012, and remained effective for a period of three years—until July 9, 2015. Netcopy and defendant entered into the Country Life agreement on July 18, 2013. (Dkt. 1-3.)

damages in the amount of £36,437.76—approximately $47,374.92 in U.S. Dollar value—for nonpayment of Netcopy's services. (Dkt. 1 at 6.) Accordingly, defendant's motion is denied.

### c. Count III: The action for open account must be dismissed

"[A]n open account is: (1) An unpaid or unsettled account. (2) An account that is left open for ongoing debit and credit entries [] that has a fluctuating balance until either party finds it convenient to settle and close, at which time there is a single liability." *Seyburn, Kahn, Ginn, Bess, Deitch & Serlin, P.C. v. Bakshi*, 483 Mich. 345, 355 (2009) (quotations omitted). An open account claim is for recovery of sums due that arose out of a course of dealings between the parties. *Fisher Sand & Gravel Co. v. Neal A. Sweebe, Inc*, 494 Mich. 543, 553 (2013). And it can be premised on either an express or implied contract. *Id.* at 570.

But "an open account cannot be established by mere performance or nonperformance of the contract obligation" where "the dealings of the parties relate entirely to and are governed by a special contract for the payment of money, at agreed upon periods." *Fisher*, 494 Mich. at 566, 568; *see Seyburn*, 483 Mich. at 357. "When an integral component of a transaction for . . . services is an express agreement for periodic payment

13

of money," "the creditor's remedy is to timely pursue a breach of contract action when the debtor fails to live up to the terms of the underlying agreement." *Fisher*, 494 Mich. at 568.

Here, the Music Project is subject to the MSA, which constitutes an express agreement for periodic payment of money and serves as an integral component of the agreement for Netcopy's services. (Dkts. 1-1, 1-2.) Thus, plaintiff cannot establish an open account claim for the Music Project. Plaintiff also fails to establish an open account claim for the Country Life agreement because it too is subject to the MSA. Because plaintiff cannot establish an action for open account, defendant's motion to dismiss this claim is granted.

### d. Count IV: The quantum meruit claim must be dismissed

Plaintiff brings the quantum meruit (*i.e.*, unjust enrichment) claim in the alternative and in the event that an express contract between the parties does not govern this dispute. (Dkt. 18 at 17.) Simultaneous and alternative claims for breach of contract and unjust enrichment cannot be brought when the claims are asserted against the same defendant with whom the plaintiff has an express contract. *Morris Pumps v. Centerline Piping, Inc.*, 273 Mich. App. 187, 199 (2006). Here, plaintiff

brings an alternative claim of quantum meruit against the same defendant with whom it has express contracts for both the Music Project and Country Life Project. (Dkts. 1-1, 1-2, 1-3.) Accordingly, defendant's motion to dismiss this claim is granted.

## IV. Conclusion

For the reasons set forth above, defendant's motion to dismiss (Dkt. 13) is GRANTED IN PART AND DENIED IN PART. Plaintiff's Counts I and II may proceed and Counts III and IV are dismissed.

IT IS SO ORDERED.

Dated: August 18, 2017　　　　　　s/Judith E. Levy
Ann Arbor, Michigan　　　　　　　JUDITH E. LEVY
　　　　　　　　　　　　　　　　United States District Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 18, 2017.

　　　　　　　　　　　　　　　　s/Shawna Burns
　　　　　　　　　　　　　　　　SHAWNA BURNS
　　　　　　　　　　　　　　　　Case Manager